1

2

3

4

5

6

7

8                              IN THE UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10    DAVID JON DILLION,

11                    Petitioner,                    No. CIV S-09-2280 EFB P

12          vs.

13    MELISSA LEA, Chief Deputy
      Administrator for the California Out
14    of State Correctional Facility Program,[1]

15                    Respondent.                    ORDER
      _____/

16

17          Petitioner is a state prisoner proceeding *in propria persona* with an application for a writ

18    of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a 2007 judgment of

19    conviction entered against him in the Shasta County Superior Court on four counts of arson, with

20    an enhancement for use of an accelerant as to one of the arson counts.  He seeks relief on the

21    _____

22          [1]  Respondent requests the substitution of Melissa Lea, Chief Deputy Administrator for
      the California Out of State Correctional Facility Program, as the correct respondent in this
      matter.  Dckt. No. 14 at 7.  At the time of this request, petitioner was incarcerated at the

23    Tallahatchie County Detention Facility in Tutwiler, Mississippi pursuant to a contract with the
      Correctional Corporation of America.  This court has independently verified that petitioner is

24    still being held at the detention facility in Mississippi.  Accordingly, the court now substitutes in
      the correct respondent, the Chief Deputy Administrator for the California Out of State

25    Correctional Facility Program.  *See Stanley v. California Supreme Court*, 21 F.3d 359, 360 (9th
      Cir. 1994) ("A petitioner for habeas corpus relief must name the state officer having custody of

26    him or her as the respondent to the petition."); Rule 2(a), 28 U.S.C. foll. § 2254.

grounds that: (1) his statements to police should not have been admitted at his trial because they were involuntary and coerced and were obtained in violation of *Miranda v. Arizona*; and (2) his trial counsel rendered ineffective assistance.  Upon careful consideration of the record and the applicable law, and for the reasons set forth below, petitioner's application for habeas corpus relief is denied.

## I.   Factual Background[2]

Here we again confront the elusive and slippery idea of just when an interrogation becomes custodial.  We must decide whether defendant David Jon Dillion, an arson suspect, was in custody when he confessed to setting five fires in his neighborhood before receiving his *Miranda* advisements.[3]  We conclude that because the interrogating officers told him before, and many times during, his examination that he was free to go and did not employ otherwise impermissibly coercive techniques, he was not in custody at the time he dribbled out his admissions.  We also conclude that his confession was voluntary.  We affirm.

### FACTS

A Redding patrol officer observed the 24-year-old defendant standing in his bathrobe, somewhat inebriated at 2:30 a.m., watching a fire burn.  He was about 50 feet from where a vegetation fire had been set 2 weeks earlier.  Defendant told the officer he had been renovating a restaurant before it burned in a fire, and he had been at a bar earlier that evening a block away from another fire.  He mentioned he was a seasonal firefighter.

The officer invited defendant to accompany him to the police investigations office for an interview but assured him he had no obligation to do so and was not required to answer any questions or to make any statements.  Defendant said he did not mind because he wanted to get the matter cleared.  The officer was not comfortable having defendant drive because he had been drinking.  Defendant got dressed and rode with the officer in a patrol car.  He was never handcuffed.

The investigations office was at a mall, not the police station, and it looked like an office building.  Two plainclothes interrogators

---

[2]  In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary.

[3]  *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

2

began to question defendant about 4:30 a.m. in a small interview room after once again assuring him he was free to go at any time and would be provided a ride home.  The door was not locked, but it did get stuck and one of the interrogators believed it was locked.

The interrogators questioned defendant for about one hour 41 minutes before he confessed to any of the arsons.  They started with friendly chatter and became increasingly accusatory.  They asked him if he thought he was a person capable of setting a fire or if he had ever given serious thought to starting one and, if so, how he might do it.  When he repeatedly denied their accusations, they asked him if he would be willing to take a polygraph examination.

The interrogators also confronted defendant with some of the evidence they believed demonstrated his culpability, including a possible eyewitness identification.  Defendant responded, "I probably should've asked at the beginning of the interview, but am I being considered a suspect?"  One of the examiners coyly stated, "Well . . . I would say you're a good witness, okay?  Um ... hmm ... no."  At various times during the examination, they offered him coffee, water, or soda.  He opted for a cigarette and used the restroom unsupervised during several breaks.

Some time later, one of the interrogators positioned himself closer to the exit of the room.  After a short break, they advised defendant that based on their considerable experience, they believed he was responsible for the fires.  Defendant continued to deny his complicity and requested an attorney.  He was told again he was not under arrest and remained free to leave.  He made several remarks about his girlfriend and how mad she would be when he returned home.

The interrogators continued to confront and cajole defendant, pointing to the unlikely proposition that he just happened to be in close proximity to five different fires within a two-week period.  They appealed to his concern for his 16-month-old baby.  Finally, they warned him that "we're gonna have to be a little more stern with ya."  Shortly thereafter, defendant confessed to setting a brush fire, and within approximately 21 minutes he admitted to 4 more fires.

Only then was he given his Miranda warnings.  During additional examination, he again confessed to perpetrating each of the five fires.  The interrogation ended at approximately 7:47 a.m., about three hours after it began.

The trial court denied defendant's motion to suppress his confessions.  He thereafter entered a slow plea of guilty to four of six counts and to the enhancement that he used an accelerant as to one count.  (Pen.Code, §§ 451, subd. (c), 451.1, subd. (a)(5).)  The court sentenced defendant to the stipulated term of 13 years in

3

state prison.  Defendant appeals the pretrial determination to admit his confessions.

Resp.'s Lodg. Doc. 2 at 1-4.

## II.   Analysis

### A.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  *See Wilson v. Corcoran*, 562 U.S.___, ___, 131 S. Ct. 13, 16 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision.  *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (*citing Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably."  *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010))

1    A state court decision is "contrary to" clearly established federal law if it applies a rule

2    contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

3    precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003).

4    Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant

5    the writ if the state court identifies the correct governing legal principle from the Supreme

6    Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[4]

7    *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360

8    F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ

9    simply because that court concludes in its independent judgment that the relevant state-court

10   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

11   application must also be unreasonable." *Williams*, 529 U.S. at 412.  *See also Schriro v.*

12   *Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal

13   habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

14   the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit

15   precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness

16   of the state court's decision." *Harrington v. Richter*, 562 U.S.___,___,131 S. Ct. 770, 786

17   (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a

18   condition for obtaining habeas corpus from a federal court, a state prisoner must show that the

19   state court's ruling on the claim being presented in federal court was so lacking in justification

20   that there was an error well understood and comprehended in existing law beyond any possibility

21   for fairminded disagreement." *Harrington*,131 S. Ct. at 786-87.

22    If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

23   court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*,

24   _____

25    [4]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
      overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
      presented in the state court proceeding." *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011)

26   (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

1   527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

2   (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of

3   § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

4   considering de novo the constitutional issues raised.").

5         The court looks to the last reasoned state court decision as the basis for the state court

6   judgment.  *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

7   If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

8   previous state court decision, this court may consider both decisions to ascertain the reasoning of

9   the last decision.  *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When

10  a federal claim has been presented to a state court and the state court has denied relief, it may be

11  presumed that the state court adjudicated the claim on the merits in the absence of any indication

12  or state-law procedural principles to the contrary."  *Harrington*, 131 S. Ct. at 784-85.  This

13  presumption may be overcome by a showing "there is reason to think some other explanation for

14  the state court's decision is more likely."  *Id*. at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797,

15  803 (1991)).  Where the state court reaches a decision on the merits but provides no reasoning to

16  support its conclusion, a federal habeas court independently reviews the record to determine

17  whether habeas corpus relief is available under § 2254(d).  *Stanley*, 633 F.3d at 860; *Himes v.*

18  *Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

19  review of the constitutional issue, but rather, the only method by which we can determine

20  whether a silent state court decision is objectively unreasonable."  *Himes*, 336 F.3d at 853.

21  Where no reasoned decision is available, the habeas petitioner still has the burden of "showing

22  there was no reasonable basis for the state court to deny relief."  *Harrington*, 131 S. Ct. at 784.

23        When it is clear, however, that a state court has not reached the merits of a petitioner's

24  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

25  habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462

26  F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook,* 333 F.3d 1052, 1056 (9th Cir. 2003).

**B. Petitioner's Claims**

**1. <u>Miranda Violation</u>**

Petitioner's first claim is that his Fifth Amendment right against self-incrimination was violated by the admission into evidence of his initial inculpatory statements to police because he had not received *Miranda* warnings at the time he made those statements.  Petitioner argues that the police were required to give him the *Miranda* warnings because he was effectively "in custody" at the time he was interrogated.  Petitioner states that after the interrogating officer told him he "knew without a doubt" that petitioner had started the fires, he did not feel that he was "free to leave" the interrogation room.  Dckt. No. 1 at 6.  Petitioner concedes that the officer told him he was "free to leave and not under arrest," but explains that he did not believe this because the officer "continued to express to me why he knew that I had committed these crimes, and made it clear to me that I was going to be charged & arrested." *Id.* at 8.  In connection with his third ground for relief, petitioner explains that "in order for me to leave, I would've had to rely on the officers to escort me out of their office, and unlock the front door for me.  Therefor, I could not leave by my own free will." *Id.*

The California Court of Appeal rejected these arguments, finding that petitioner was not "in custody" when he was interrogated.  The court reasoned as follows:

> **I. WAS DEFENDANT IN CUSTODY?**
>
> Because the Fifth Amendment to the United States Constitution protects the right against self-incrimination, a suspect's statements to law enforcement during custodial interrogation cannot be introduced in a criminal trial unless they were preceded by an express admonition to the suspect outlining his constitutional rights and the consequences of waiving those rights.  (*People v. Mayfield* (1997) 14 Cal.4th 668, 732, 60 Cal.Rptr.2d 1, 928 P.2d 485.)  Custodial interrogation is considered "inherently coercive," and therefore the right against self-incrimination is most vulnerable and fragile.  (*People v. Boyer* (1989) 48 Cal.3d 247, 271, 256 Cal.Rptr. 96, 768 P.2d 610 ( Boyer ), *disapproved on other grounds in People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1, 38 Cal.Rptr.2d 394, 889 P.2d 588.)  Defendant confessed before his interrogators explained his constitutional rights to him as demanded by *Miranda*.  The prosecution, therefore, bore the

7

burden of proving that he was not in custody in order to use his statements against him.  (*People v. White* (1968) 69 Cal.2d 751, 759-761, 72 Cal.Rptr. 873, 446 P.2d 993.)

Custody, for these purposes, means a """formal arrest or restraint on freedom of movement"'" where the restraint is "'of the degree associated with a formal arrest.'"  (*Boyer, supra*, 48 Cal.3d at p. 271, 256 Cal.Rptr. 96, 768 P.2d 610, *quoting California v. Beheler* (1983) 463 U.S. 1121, 1125 [77 L.Ed.2d 1275].)  Defendant was not placed under formal arrest at the scene of the arson.  Rather, he was asked if he would answer some questions at the police investigations office.  Because he was explicitly told he did not have to accompany the officers, he did not have to answer their questions, and he was free to leave at any time, he was not in custody when he arrived at the office for questioning.

Nor was his freedom curtailed at the outset of the interrogation.  Again, he was expressly told he could leave and that, if at any time during the examination he wanted to go home, he would be provided a ride.  Thus, as the interrogation began, he was not in custody.

Defendant insists, however, that as the interrogation dragged on, his interrogators became more stern and accusatory, he tired, and the interrogators identified him as the perpetrator, he no longer enjoyed the freedom of movement necessary to avoid an inherently coercive atmosphere.  In deciding whether the interrogation became custodial before he was advised of his *Miranda* rights, we must examine the totality of the circumstances.

The single most important circumstance in this case is the fact defendant was told at least six times that he was free to leave and did not have to answer their questions.  There is nothing in the record to undermine the clarity of what defendant was explicitly told.  In other words, there were no subtle indicia of an arrest.  He was not handcuffed.  He was not locked in a room.  He was not restrained.  The officers did not ignore a request to leave.  Rather, he was offered refreshments and given unsupervised breaks.  Objectively, defendant remained free to terminate the interrogation and simply did not avail himself of the opportunity.

It is true that the interrogation became intense and uncomfortable.  The interrogators suspected defendant was the perpetrator of multiple fires and truthfully told him so.  And it took nearly two hours of skilled interrogation to convince defendant to tell the truth.  But effective interrogation is not, by definition, custodial.  Defendant seems to imply that as the interrogation became more focused, uncomfortable, and prolonged, he no longer retained the freedom to leave despite the repeated assurances of his interrogators to the contrary.

Under slightly different circumstances, of course, an interrogation might become custodial when the suspect, for all practical purposes, no longer can leave the interrogation.  Defendant cites the facts of *Boyer, supra*, 48 Cal.3d 247, 256 Cal.Rptr. 96, 768 P.2d 610 to demonstrate that his situation, like Mr. Boyer's, "quickly ripened into a full-blown arrest inside the station house." (*Id.* at p. 268.)  *Boyer*, in fact, is easily distinguished.

First, we point out that *Boyer* involved the Fourth, not the Fifth, Amendment, and as the court explained, "Because of the particular interests protected by the Fourth Amendment, a statement must be suppressed, even when knowing, voluntary, and intelligent, if it is the direct product of an illegal arrest or detention." (*Boyer, supra*, 48 Cal.3d at p. 267, 256 Cal.Rptr. 96, 768 P.2d 610.)  Also unlike the case before us, the defendant was informed of his *Miranda* rights.  Thus, the right sought to be protected was not against self-incrimination but against unlawful detention.

Nevertheless, the prosecution in *Boyer*, as in this case, argued that the encounter with the police was consensual and did not constitute a detention or arrest and the defendant was not in custody.  There are notable, in fact dispositive, distinctions between the two cases. Boyer was never told he could leave and was led to believe he could not.  (*Boyer, supra*, 48 Cal.3d at pp. 267-268, 256 Cal.Rptr. 96, 768 P.2d 610.)  The police falsely told him they knew he was the killer and had all the necessary evidence.  (*Id.* at p. 268, 256 Cal.Rptr. 96, 768 P.2d 610.)  They evaded all questions he asked as to whether he was under arrest.  (*Ibid.*)

Defendant, by contrast, was told repeatedly he could leave and was provided the opportunity to do so.  He chose not to and, as the trial court found, his comments suggested that he indeed felt free to leave.  While his subjective assessment of his freedom is not determinative, it is yet another circumstance we can consider in evaluating the totality of the circumstances that would lead a reasonable person to believe his freedom had been curtailed.

In sum, defendant is right that he was a suspect subjected to skillful interrogation.  But that alone does not trigger the need for a *Miranda* advisement, for as long as he could freely leave the interrogation the circumstances were not inherently coercive and the dangers the Fifth Amendment were designed to minimize did not arise.

Resp.'s Lodg. Doc. 2 at 4-8.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court held that the Fifth Amendment privilege against self-incrimination prohibits the admission into evidence of statements given by a suspect during "custodial interrogation" without a prior warning.  *Id.* at

444.  *See also Stanley v. Schriro*, 598 F.3d 612, 618 (9th Cir. 2010) (*Miranda* warnings are required only where the suspect is "in custody").  Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Miranda*, 384 U.S. at 444.  Whether a suspect is "in custody" for purposes of *Miranda* requires application of an objective test.  *J.D.B. v. North Carolina*, ___ S.Ct. ___, No. 09-11121, 2011 WL 2369508, at *5 (S.Ct.  June 16, 2011); *Yarborough v. Alvarado*, 541 U.S. 652, 662-63 (2004).  Two inquiries are necessary for a determination of an individual's "in custody" status under this test: (1) what were the overall circumstances surrounding the interrogation; and (2) given those circumstances, would a reasonable person in the suspect's situation have felt free to terminate the interrogation and leave.  *J.D.B.*, 2011 WL 2369508 at*6; *Yarborough*, 541 U.S. at 662-63; *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *Stansbury v. California*, 511 U.S. 318, 322 (1994).

The ultimate question before this court is whether the California Court of Appeal applied *Miranda* in an objectively unreasonable manner when it concluded that petitioner was not "in custody" when he confessed.  In making this determination, this court is bound by the following general guidelines:

> The term "'unreasonable'" is "a common term in the legal world and, accordingly, federal judges are familiar with its meaning." (citation omitted.)  At the same time, the range of reasonable judgment can depend in part on the nature of the relevant rule.  If a legal rule is specific, the range may be narrow.  Applications of the rule may be plainly correct or incorrect.  Other rules are more general, and their meaning must emerge in application over the course of time.  Applying a general standard to a specific case can demand a substantial element of judgment.  As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Yarborough*, 541 U.S. at 663.  "The custody test is general."  *Id.* at 665.  Accordingly, the state court had "more leeway" in determining whether the circumstances indicated petitioner was "in custody" during his interrogation.

1    The decision of the California Court of Appeal is not unreasonable under these standards.

2    The objective circumstances of petitioner's police interrogation support the state court's

3    conclusion that petitioner was not "in custody" during his interrogation.  It is significant in this

4    regard that petitioner was repeatedly told he was free to leave.  A reasonable person would

5    understand from this that he was, in fact, free to leave.  Further, as noted by the California Court

6    of Appeal, the police interrogators did nothing to contradict this explicit statement: he was not

7    locked into the interrogation room, although the door was apparently stuck; he was not

8    handcuffed; he was not denied permission to leave; and he was given unsupervised breaks.

9    Petitioner was specifically told at the beginning of the interrogation that "at any point during our

10   conversation if you want to take off, I'll give you a ride home, I'll show you the door, whatever

11   you want to do."  Clerk's Transcript on Appeal (CT) at 231.  There is no evidence petitioner

12   would have been denied permission to leave or that the officers would have refused to open the

13   door for him.  As stated by the California Court of Appeal, "[o]bjectively, defendant remained

14   free to terminate the interrogation and simply did not avail himself of the opportunity."  Resp.'s

15   Lodg. Doc. 2 at 6.

16   Petitioner states that he did not feel free to leave after the interrogating officer told him

17   that he suspected him of starting the fires, thereby making it clear to petitioner that he was going

18   to be charged and arrested.  Dckt. No. 1 at 7, 8.  On the other hand, the trial court found that

19   petitioner's comments during the interrogation suggested he believed he *was* free to leave.  *See*

20   Reporter's Transcript on Appeal (RT) at 60 (trial judge noted that petitioner "continued to think

21   he was leaving after the interview" in light of his comments about "when I get home" and "I'm

22   afraid to go home.").  Regardless of petitioner's state of mind, his subjective view that he was in

23   custody during the interrogation is not dispositive of this claim.  "[T]he initial determination of

24   custody depends on the objective circumstances of the interrogation, not on the subjective views

25   harbored by either the interrogating officers or the person being questioned."  *Stansbury*, 511

26   U.S. at 323.  *See also J.D.B.*, 2011 WL 2369508, at *6 ("[t]he test, in other words, involves no

consideration of the 'actual mindset' of the particular suspect subjected to police questioning");

*United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002) ("The ['in custody'] inquiry focuses on the objective circumstances of the interrogation, not the subjective views of the officers or the individual being questioned.").  As noted above, the test to determine whether a suspect is "in custody" is an objective one.  The objective circumstances of this interrogation were not custodial for the reasons set out in detail by the California Court of Appeal.

Petitioner also argues that the increasingly accusatory statements of the interrogating officers caused him, later in the interrogation, to believe he was not free to leave.  It is true that "an officer's expressed suspicions may be relevant to the issue of custody."  *See Stansbury*, 511 U.S. at 325 ("an officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned").  However,

> those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.' (citations omitted).  Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest.  The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case.  In sum, an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.

*Id.* at 325.  *See also Stanley*, 598 F.3d at 619 (rejecting petitioner's argument that the increasingly severe nature of the questioning rendered him "in custody").  Although the fact that the officers' remarks and questions were increasingly accusatory arguably weighs in favor of a determination that petitioner was in custody, the court of appeal's decision to the contrary was not objectively unreasonable in light of the other factors, described by that court, militating against a finding of custody.

1    This court concludes that the California Court of Appeal reasonably applied federal law

2    in determining that petitioner's *Miranda* rights were not violated during his interrogation. *See*

3    *Stanley*, 598 F.3d at 619.  Accordingly, petitioner is not entitled to relief on this claim.[5]

4    _____

5    ⁵ In *Missouri v. Seibert*, 542 U.S. 600 (2004), the United States Supreme Court
     addressed the admissibility of a confession obtained after a *Miranda* warning but preceded by
6    the suspect's earlier, unwarned incriminating statements.  The court held that a trial court must
     suppress a confession obtained after a *Miranda* warning if it was obtained during a deliberate
7    "two step" interrogation where the police deliberately withheld the *Miranda* warning until the
     suspect confessed, followed by a *Miranda* warning and a repetition of the confession previously
8    given.  *Id.* at 604.  The holding in *Seibert* has been summarized by the Ninth Circuit Court of
     Appeals as follows:

9
           In sum, when a law enforcement officer interrogates a suspect but
10         does not give a *Miranda* warning until after obtaining a confession
           or an incriminating statement, a court in deciding whether to
11         suppress a subsequent postwarning confession must determine
           whether the warning was deliberately withheld.  The court should
12         consider any objective evidence or available expressions of
           subjective intent suggesting that the officer acted deliberately to
13         undermine and obscure the warning's meaning and effect.

14   *United States v. Williams*, 435 F.3d 1148, 1160 (9th Cir. 2006).  In this case, petitioner confessed
     during the initial interrogation to starting all five of the fires, was then given his *Miranda*
15   warnings, and thereafter repeated his confession.  This process appears to mirror the "two-step"
     procedure discussed in *Seibert*.  However, there is no evidence in the record, and petitioner does
16   not argue, that the police deliberately withheld the *Miranda* warnings at the beginning of the
     interrogation in order to undermine *Miranda*, or that they employed the two-step tactic "to
17   render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them,
     after the suspect has already confessed."  *Seibert*, 542 U.S. at 611.  *See also Thompson v.*
18   *Runnels*, ___ F.3d ___, No. 08-16186, 2011 WL 2279451, at *12 (9th Cir. June 9, 2011) ("After
     *Seibert*, to determine whether post-confession warnings are effective, courts must first assess
19   whether the two-step interrogation was a deliberate strategy.").  There is also no substantial
     evidence that the midstream *Miranda* warning in this case failed to effectively apprise petitioner
20   of his rights.  *See Seibert*, 542 U.S. at 616; *Williams*, 435 F.3d at 1150 (holding, in the context of
     a direct appeal from a federal criminal conviction, that a trial court must suppress post-warning
21   confessions obtained during a deliberate two-step interrogation only where the midstream
     *Miranda* warning, in light of the objective facts and circumstances, did not effectively apprise
22   the suspect theat he had a "genuine choice whether to follow up on [his] earlier admission").
     Nor is there evidence that the police questioning was coercive or resulted in involuntary
23   statements.  *See Oregon v. Elstad*, 470 U.S. 298, 318 (1985) (holding that "a suspect who has
     once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his
24   rights and confessing after he has been given the requisite *Miranda* warnings.").  In addition, as
     described above, and unlike the defendants in *Seibert* and *Williams*, petitioner was not "in
25   custody" when he was questioned by police prior to receiving his *Miranda* warnings.  For these
     reasons, the decision of the California Court of Appeal rejecting petitioner's claim is not
26   contrary to or an unreasonable application of *Seibert*.

1            2.  **Involuntary Confession**

2            In his next ground for relief, petitioner claims that his statements to police should not

3    have been admitted into evidence at his trial because they were involuntary and coerced.  He

4    states that one of the interrogating officers told him that "he would take this case to the federal

5    system, and have me do time in federal prison" and that "he could help me avoid federal

6    prosecution, if I confessed because he was in the position to get me state or federal time."  Dckt.

7    No. 1 at 6, 8.

8            The California Court of Appeal denied this claim, reasoning as follows:

9            **II. WAS THE CONFESSION VOLUNTARY?**

10           The prosecution also bore the burden of proving the confession
             was voluntary.  (*Colorado v. Connelly* (1986) 479 U.S. 157, 163
11           [93 L.Ed.2d 473].)  The trial court found the prosecution had
             sustained its burden.  Although we independently assess the
12           ultimate legal issue of voluntariness, we too conclude the
             confession was not coerced given the totality of the circumstances
13           in which it was made.  (*People v. Williams* (1997) 16 Cal.4th 635,
             659-660, 66 Cal.Rptr.2d 573, 941 P.2d 752; *People v. Bradford*
14           (1997) 14 Cal.4th 1005, 1041, 60 Cal.Rptr.2d 225, 929 P.2d 544.)

15           Defendant complains that he was young, tired, depressed, and
             drunk.  At 24 years old, he was, in fact, an adult who had earned a
16           GED diploma, had passed a firefighting certification course, had
             held various jobs, and had experience with law enforcement and
17           probation.  Although we acknowledge he had been up all night
             after drinking and was challenged by the realities of life, we reject
18           the notion that he was unduly susceptible to succumbing to his
             interrogators' suggestions that he had committed the arsons if, in
19           fact, he had not.  The transcript of his interrogation does not
             suggest he was disintegrating during the course of the examination
20           or experiencing any undue influence.  He remained coherent,
             intelligent, and responsive.

21
             Nor do we believe that the officers' encouragement to tell the truth
22           as a means of avoiding federal prosecution tainted the
             examination.  As defendant accurately points out, "'advice or
23           exhortation by a police officer to an accused to "tell the truth" or
             that "it would be better to tell the truth" unaccompanied by either a
24           threat or a promise, does not render a subsequent confession
             involuntary.' [Citation.]"  (*People v. Hill* (1967) 66 Cal.2d 536,
25           549, 58 Cal.Rptr. 340, 426 P.2d 908.)  "[I]nvestigating officers are
             not precluded from discussing any 'advantage' or other
26           consequence that will 'naturally accrue' in the event the accused

                                                    14

speaks truthfully about the crime. [Citation.]"  (*People v. Ray* (1996) 13 Cal.4th 313, 340, 52 Cal.Rptr.2d 296, 914 P.2d 846.)

The officers never promised defendant he would avoid federal prosecution.  They did, however, suggest that his willingness to tell the truth, sooner rather than later, might lessen the chance of a federal prosecution.  And they did point out the distinction between a serial arsonist and someone with emotional problems starting a few small fires with little appreciation for the damage they might cause.  *People v. Vasila* (1995) 38 Cal.App.4th 865, 45 Cal.Rptr.2d 355 (*Vasila*) provides a fitting contrast.

In *Vasila*, the "defendant's invocation [of the right to remain silent] was ignored; he indicated he was fatigued to the point that he did not trust his own judgment, and his interrogators made both implied threats and blatant promises." (*Vasila, supra*, 38 Cal.App.4th at p. 875, 45 Cal.Rptr.2d 355.)  The defendant was promised he would avoid federal prosecution and be released on his own recognizance "if he told them where the guns were hidden." (*Id.* at p. 874, 45 Cal.Rptr.2d 355.)  He was also told he could be held without the opportunity to make a phone call. (*Id.* at p. 877, 45 Cal.Rptr.2d 355.)  Not surprisingly, the Court of Appeal held that the defendant's ensuing confession was coerced.  (*Ibid.*)

By way of contrast, we return to the distinguishing feature of this case.  Defendant, unlike Mr. Vasila, was told repeatedly that he was free to leave.  This assurance was not predicated on what he said.  Rather, the assurance was unequivocal – from before he left his apartment to the time he received his Miranda warnings he was free to leave no matter what he said.  While the interrogators suggested, more than once, that he might be able to avoid federal prosecution, they never promised he would.  The interrogators were, to be sure, persistent and effective.  But unlike their counterparts in *Vasila*, their techniques did not become coercive because they did not employ trickery or deceit, they did not become unduly aggressive or threatening, and they continued to remind defendant he did not have to participate in the interrogation at all.  As a result, we conclude the record does not demonstrate that defendant's will had been overcome or his confession was involuntary.

Resp.'s Lodg. Doc. No. 2 at 8-10.

The Constitution demands that confessions be made voluntarily.  *See Lego v. Twomey*, 404 U.S. 477, 483-85 (1972).  Involuntary confessions may not be used to convict criminal defendants because they are inherently untrustworthy and because society shares "the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life

and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." *Spano v. New York*, 360 U.S. 315, 320-21 (1959) .  A confession is voluntary only if it is "'the product of a rational intellect and a free will.'" *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989) (quoting *Townsend v. Sain*, 372 U.S. 293, 307 (1963)).  *See also Blackburn v. Alabama*, 361 U.S. 199, 208 (1960).  "The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991) (en banc) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).  Voluntariness is to be determined in light of the totality of the circumstances. *See Miller v. Fenton*, 474 U.S. 104, 111 (1985); *Haynes v. Washington*, 373 U.S. 503, 513 (1963).  In the end the court must determine under the totality of the circumstances whether "the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Beaty v. Stewart*, 303 F.3d 975, 992 (quoting *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988)).  *See also Hutto v. Ross*, 429 U.S. 28, 30 (1976).

Officials cannot extract a  confession "by any sort of threats or violence, nor . . . by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Hutto*, 429 U.S. at 30 (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)).[6]  Neither physical intimidation nor undue psychological pressure is permissible. *United States v. Haswood*, 350 F.3d 1024, 1027 (2003).  *See also Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (confession found to be coerced by officers' false statements that state financial aid for defendant's infant children would be cut off, and her children taken from her, if she did not cooperate); *Rogers v. Richmond*, 365 U.S. 534, 541-45 (1961) (defendant's confession was

---

[6]  This broadly-stated rule has not been applied to invalidate, per se, all statements made by a suspect in response to a promise made by law enforcement personnel.  Rather, the promise must be sufficiently compelling to overbear the suspect's will in light of all attendant circumstances. *See Hutto*, 429 U.S. at 30.

1  coerced when it was obtained in response to a police threat to take defendant's wife into

2  custody); *Miranda*, 384 U.S. at 476 ("any evidence that the accused was threatened, tricked, or

3  cajoled into a waiver (of Fifth Amendment right to remain silent) will, of course, show that the

4  defendant did not voluntarily waive his privilege"); *United States v. Tingle*, 658 F.2d 1332, 1335

5  (9th Cir. 1981) ("subtle psychological coercion suffices . . . at times more effectively 'to

6  overbear a rational intellect and a free will'"). *But cf. Pollard v. Galaza*, 290 F.3d 1030, 1034

7  (9th Cir. 2002) ("misrepresentations made by law enforcement in obtaining a statement, while

8  reprehensible, does not necessarily constitute coercive conduct").

9          This court has reviewed the transcript of petitioner's interrogation and agrees with the

10  conclusions reached by the California Court of Appeal.  There is no evidence petitioner was

11  coerced to confess to a crime he did not commit or that he was intimidated or worn down by

12  improper interrogation tactics, lengthy questioning, or anything else.  There is also no evidence

13  that petitioner's will was overborne by the overall circumstances or the conduct of the

14  interrogation.  As noted by the California Court of Appeal, the interrogators "did not employ

15  trickery or deceit, they did not become unduly aggressive or threatening, and they continued to

16  remind [petitioner] he did not have to participate in the interrogation at all."  Resp.'s Lodg. Doc.

17  2 at 10.  Petitioner was alert and articulate throughout the interrogation, he was told multiple

18  times he was free to leave, and he took several voluntary breaks.

19          It is true that one of the interrogating officers mentioned the possibility that petitioner

20  could be facing federal charges.  Specifically, petitioner was told the following:

21              [Officer] SC: . . . it's not a question of us trying to talk you into it,
                we know it at this point.  Now is the point for you to come forward
22              and say, look, we got the federal government involved in this, do I
                really want to take this to the point that I'm facing federal charges
23              for multiple arsons or can we kind of take care of this somewhere
                else?  I mean, this is a small town . . .
24
                [Officer] AM: 'Cause that's a decision that, fortunately you're
25              talking to two senior law enforcement officers.  That's something
                that we can make a decision on, ya know, as far as can we keep
26              this in the state system . . .

1      SC: Yeah.

2      AM: . . .you would prefer to keep this in this state system, do you
       understand that?

3

4   (CT at 287.)

5      SC: Well, I'll tell you what.  If you're not, if you're not willing to,
       to come clean, you're looking at at least that from the federal side
6      and I'll be more than happy to take this case to the federal, federal
       system because . . . you know . . .

7
       AM: Do you know, do you know why the feds are involved, Dave?

8
       DD [petitioner]: No.

9
       AM: Commercial property.  Okay?  Does that mean they have to
10     stay involved?  No.  I've . . .

11     SC: The US Attorney and the District Attorney will get together
       and make the decisions.  We are the ones that tell them this is what
12     we found.  Here we've got a guy who's a firefighter who's having
       a hard time making things, making ends meet, goes out and gets
13     drunk, you know, he, so he goes and starts a few trash fires for fun
       or for, for whatever, frustration maybe.  That, we could say that or
14     we could say we've got a serial arsonist.  The serial arsonist is
       running around Redding, uh, within about a six-week period.
15     We've got a car down the street from his house that's burned,
       you've got a history of stolen cars, I mean, here's a stolen car
16     that's torched.  See the point?  I mean, put yourself in the position
       of the attorneys and they're gonna say, do we gotta guy here
17     who's, who's a young person who's made some mistakes, who's
       who's had trouble in the past, is trying to get his life in order, but
18     yet he went out and got bombed and made a few small mistakes or
       do we have a, do we have a, uh, honest to God arsonist running
19     around just trying to burn things up out from under people?  That's
       kind of what they're they're gonna be looking for.  Ya know, they,
20     they've got more than enough cases to work.  We're not trying to
       run around, put everybody we find into jail for five, ten, fifteen,
21     twenty years like that.  But . . . ya know, we've got a situation and
       it's already happened, so now we've gotta try to figure out how to
22     handle it the best we can.

23  *Id.* at 298-99.  These comments could be construed as a promise that the interrogating officers

24  would present petitioner's circumstances in a more positive light to the prosecuting authorities if

25  he told the truth about his role in the fires.  However, the police did not promise that petitioner

26  could avoid federal prosecution if he confessed; on the contrary, petitioner was clearly advised

18

that the prosecutors would make that decision.  After reviewing the entire interrogation, it does

not appear to this court that the officers' remarks about possible federal criminal prosecution

caused petitioner to make an involuntary confession.

The decision of the California Court of Appeal that petitioner's confession was voluntary

is not contrary to or an unreasonable application of the federal authorities set forth above.

Accordingly, petitioner is not entitled to relief on this claim.

### 3. Ineffective Assistance of Counsel

Petitioner's final claim is that his trial counsel rendered ineffective assistance.  His claim

is stated, in its entirety, as follows:

> My attorney faild [sic] to state that because the place I was being
> held, was offices used by police for questioning in a public
> building.  Being that, the front doors had to be unlocked to let me
> in, and locked again to keep the building secure because the time
> was 4:30 a.m. this is important because even though the officers
> said I was free to leave, as a reasonable person I felt I was not.
> Because in order for me to leave, I would've had to rely on the
> officers to escort me out of their office, and unlock the front door
> for me.  Therefor, I could not leave by my own free will.

Dckt. No. 1 at 7, 8.  The court will construe these allegations as a claim that petitioner's trial

counsel rendered ineffective assistance in failing to support his motion to suppress with evidence

that the front door to the building where petitioner was interrogated was locked before and

during the interrogation because the questioning took place after business hours.

Respondent argues that this claim has not been exhausted in state court.  Generally, a

state prisoner must exhaust all available state court remedies, either on direct appeal or through

collateral proceedings, before a federal court may consider granting habeas corpus relief.  28

U.S.C. § 2254(b)(1).  However, a federal court considering a habeas petition may deny an

unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable"

*Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005).  Assuming arguendo that petitioner's

claim of ineffective assistance of counsel has not been exhausted, the court will deny it on the

merits.

The Sixth Amendment guarantees the effective assistance of counsel.  The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  *Id*. at 687-88.  After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  *Id*. at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  Second, a petitioner must establish that he was prejudiced by counsel's deficient performance.  *Strickland*, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  *Id.  See also Williams*, 529 U.S. at 391-92; *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."  *Strickland*, 466 U.S. at 697.

In assessing an ineffective assistance of counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.'"  *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (quoting *Strickland*, 466 U.S. at 689).  There is in addition a strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made."  *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (citing *Strickland*, 466 U.S. at 689).  However, that deference "is predicated on counsel's performance of sufficient investigation and preparation to make reasonably informed, reasonably sound judgments."  *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc).

1    Petitioner has failed to demonstrate either deficient performance or prejudice with respect

2  to this claim.  Petitioner has pointed to no evidence that the front door to the building where he

3  was interrogated was locked during the interrogation, or that counsel was aware it was locked.[7]

4  In any event, evidence that the door to the building had to be unlocked in order for petitioner and

5  the police officers to enter or leave would not have resulted in a more favorable outcome on the

6  motion to suppress.  Regardless of whether the building had to be unlocked, or whether the door

7  to the interview room was stuck, petitioner was told repeatedly that he was free to leave.  He was

8  also told that if he wanted to leave, the officers would "give you a ride home, . . . show you the

9  door, whatever you want to do."  CT at 231.  In short, the condition of the doors did not prevent

10  petitioner's exit from the building.  Further, as discussed above, the totality of the circumstances

11  demonstrate that petitioner was not "in custody" for purposes of the *Miranda* decision during his

12  interrogation.

13    Because petitioner has failed to demonstrate that his trial counsel's performance was

14  deficient or that it resulted in prejudice to petitioner, he is not entitled to relief on this claim.

15  **III.  Conclusion**

16    For all of the foregoing reasons, IT IS ORDERED that:

17    1.  Petitioner's application for a writ of habeas corpus is denied;

18    2.  The Clerk is directed to close the case; and

19    3.  The court declines to issue a certificate of appealability.

20  DATED: January 4, 2012.

21

22  EDMUND F. BRENNAN
   UNITED STATES MAGISTRATE JUDGE

23

24

_____

25    [7] Evidence was introduced during the hearing on the motion to suppress that the door to
   the interview room got stuck during the interrogation and appeared to be locked, even though it
26  wasn't actually locked.  (RT at 37-40.)

21